[No. 60031-7.   En Banc.   December 30, 1993.]

JAMES H. STANTON ET AL, *Respondents*, v. BAYLINER MARINE CORPORATION, *Petitioner*.

ALBANY INSURANCE COMPANY, *Respondent*, v. BAYLINER MARINE CORPORATION, *Petitioner*.

*Mikkelborg, Broz, Wells & Fryer,* by *Dexter A. Washburn* and *Newell D. Smith,* for petitioner.

*Schwabe, Williamson, Ferguson & Burdell,* by *Dennis A. Ostgard* and *Jerome C. Scowcroft,* for respondents.

GUY, J. — In consolidated actions against Bayliner Marine Corporation and Olympic Sales, Inc. (hereafter collectively Bayliner), plaintiffs seek recovery of the cost of replacing or repairing damaged yachts. Bayliner seeks review of a Court of Appeals decision reversing the trial court's order of partial summary judgment in its favor. We reverse the Court of Appeals.

## BACKGROUND

In December 1985, plaintiffs James Stanton, Winnifred Stanton, and Stanton Investment Company purchased the *M/Y Moonraker,* a 45-foot model 4550 Bayliner motor yacht, from Olympic Sales, Inc., doing business as Olympic Boat Centers, in Seattle, Washington, for $225,342. In April 1988, plaintiff Wiley Dean Henry purchased the *M/Y Contessa,* also a Bayliner model 4550 motor yacht, from Olympic Sales, Inc., for $251,548.70. Albany Insurance Company insured both yachts.

On separate occasions, while the Stantons and Henry were pleasure boating, their yachts struck underwater objects. The *Moonraker* struck a submerged rock in Puget Sound in 1987, while the *Contessa* struck a reef off of Vancouver Island, Canada, in 1988. Both yachts sustained severe hull damage which caused mass flooding. The Stantons' boat rapidly sank, but the Stantons were rescued by

nearby boaters. Henry's boat remained lodged on the rocks; Henry and his passengers were rescued by a Canadian maritime helicopter. No one suffered personal injury in either incident. Each boat was determined to be a constructive total loss. Salvage values for each boat ranged between $42,000 and $46,000.

The Stantons and Albany, under its subrogated interest from Henry, brought suits against Bayliner and Olympic Sales for products liability, negligence, breach of warranty, and violation of the Consumer Protection Act. The plaintiffs primarily seek to recover their "economic losses", or the cost of replacing and repairing the yachts. In addition, the Stantons claim loss of various items of personal property having an alleged combined value of approximately $25,000. The plaintiffs submitted the declaration of Mr. Ted Drake, a naval architect/marine engineer, who stated that the keel design of the Bayliner model 4550 was defective and created an unreasonable risk of mass flooding should penetration occur due to accidental grounding or stranding. Mr. Drake also stated that certain design techniques could have prevented the mass flooding.

Citing *East River S.S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 90 L. Ed. 2d 865, 106 S. Ct. 2295 (1986), Bayliner moved for summary judgment, claiming that admiralty law applies and precludes recovery for economic losses under either tort theory of products liability or negligence. Bayliner also argued that plaintiffs' warranty claim, governed by state law, did not allow recovery against Bayliner under a breach of warranty theory since the plaintiffs and Bayliner did not have privity of contract. Plaintiffs cross-moved for partial summary judgment, claiming that the Washington products liability act governed the facts of this case thereby permitting the recovery sought. The trial court granted Bayliner's motion, dismissing substantially all of plaintiffs' claims,[1] and entered an order of finality. The

---

[1]The trial court left intact plaintiffs' warranty claims against defendant Olympic Sales, and the Stantons' claim for losses to personalty which was not equipment or furnishings of the *Moonraker*.

plaintiffs appealed, claiming that the Washington products liability act (WPLA) applies and provides a remedy for the economic losses sustained in this case. *See Washington Water Power Co. v. Graybar Elec. Co.*, 112 Wn.2d 847, 774 P.2d 1199, 779 P.2d 697 (1989) (economic loss within context of WPLA determined by "risk of harm" analysis).

The Court of Appeals reversed and remanded, holding that while admiralty jurisdiction applied, substantive admiralty law permits the application of state tort law to determine whether economic loss is compensable. *Stanton v. Bayliner Marine Corp.*, 68 Wn. App. 125, 130-33, 844 P.2d 1019 (1992). In view of *Graybar*'s explicit and unequivocal rejection of *East River*'s approach to "economic loss", the Court of Appeals concluded that Washington has a significant interest in a divergent interpretation of economic loss, and that the plaintiffs' claims may properly be heard under the WPLA. *Bayliner*, 68 Wn. App. at 133.

We granted Bayliner's petition for review. We reverse the Court of Appeals.

## Issue

The sole issue before us is whether the plaintiffs may recover damages for economic loss under Washington law in a tort claim arising under admiralty jurisdiction but filed in state court. Because the plaintiffs' claims arise under admiralty jurisdiction, we hold that substantive admiralty law precludes application of a state law remedy for the economic loss of the yachts; plaintiffs' claim for damages may properly be pursued in warranty against the seller under the Uniform Commercial Code (RCW 62A).

## Analysis

### I

#### Background

These consolidated cases were brought by the plaintiffs to recover for the loss of two Bayliner boats and personal property on board at the time of the boats' grounding. The plaintiffs primarily seek to recover damages for "economic loss" — the cost of replacing and repairing the yachts. To

better understand the economic loss rule in the context of this case, we first must discuss relevant portions of the WPLA, the Supreme Court's decision in *East River*, and this court's decision in *Graybar*.

Under the WPLA,[2] a purchaser of a defective product may assert a product liability claim against a "product seller", which includes a manufacturer, wholesaler, distributor, or retailer of the product. RCW 7.72.010(1). A "product liability claim" includes, in relevant part, any claim or action brought for *harm* caused by the manufacture, construction, fabrication, production, design or marketing of the relevant product. RCW 7.72.010(4). The WPLA broadly defines "harm" as "any damages recognized by the courts of this state: PROVIDED, That the term 'harm' does not include direct or consequential economic loss under Title 62A RCW [UCC]." RCW 7.72.010(6). The WPLA therefore provides no recovery for direct or consequential economic loss. *See Washington Water Power Co. v. Graybar Elec. Co., supra. See also* Comment, *Determining Recoverable Economic Harm Under the Washington Product Liability Act,* 27 Gonz. L. Rev. 335, 337 (1991-1992). The WPLA does not prevent the recovery of direct or consequential economic loss under RCW Title 62A (UCC). RCW 7.72.020(2).

In *East River S.S. Corp.*, the Supreme Court held that no products liability claim lies in admiralty when the only injury claimed is economic loss. *East River*, 476 U.S. at 871, 876. In *East River*, a group of ship charterers sued a shipbuilder who had contracted to design, manufacture, and install turbines which would be the main propulsion unit for four 225,000-ton, $125 million, supertankers. *East River*, 476 U.S. at 859. When the ships were put into service, the turbines on all four malfunctioned because of design and manufacturing defects. However, only the products themselves were damaged. The charterer sued in federal court, alleging tortious conduct based on the products liability doctrine, and asked for damages for the cost of repairing the ships and for income lost while they were out of service.

---

[2]RCW 7.72.010-.060.

*East River*, 476 U.S. at 861. The harm was pure economic loss, without physical injury to either a person or other property.

In *East River*, the Supreme Court incorporated products liability, including strict liability, into the general maritime law. *East River*, 476 U.S. at 865. The Court also resolved the issue of whether a plaintiff in a maritime products liability action could recover damages for economic loss. Exercising its discretion in admiralty, a unanimous Court held that a "manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself." *East River*, 476 U.S. at 871. Therefore, when a product damages only itself, and not persons or other property, the proper remedy lies in contract, not in tort, no matter how the product injury occurred. *East River*, 476 U.S. at 871-72.

In *Washington Water Power Co. v. Graybar Elec. Co., supra*, a nonadmiralty case, this court found *East River*'s approach to "economic loss" unsuited to what the Legislature intended under the WPLA. *Graybar*, 112 Wn.2d at 864. In *Graybar*, Washington Water Power (WWP) sued the manufacturer and distributor of electric deadend insulators in federal district court to recover damages incident to the failure of thousands of insulators. WWP's complaint alleged, among other things, violation of the WPLA, as well as negligence and strict liability under the common law. *Graybar*, 112 Wn.2d at 849. While WWP claimed that the defective insulators had caused some bodily injury and property damage, the bulk of WWP's claim involved the cost of replacing the insulators. *Graybar*, 112 Wn.2d at 849.

The defendants moved for partial summary judgment on WWP's tort claims, arguing that the costs of WWP's insulator replacement program constituted economic loss recoverable only under the UCC since the WPLA excludes economic loss from its remedial scheme and preempts common law tort remedies. *Graybar*, 112 Wn.2d at 850. The Federal District Court certified to this court the issues of the nature of WWP's loss, whether the WPLA applied, and if so,

whether economic loss was recoverable under the act. *Graybar*, 112 Wn.2d at 847-48. The *Graybar* court responded that the WPLA creates a single cause of action for product-related harms that preempts common law remedies and that the WPLA does not afford a remedy for economic loss. *Graybar*, 112 Wn.2d at 860. The court, however, declined to follow *East River*'s economic loss rule. *Graybar*, 112 Wn.2d at 864-66. The court held instead that whether economic losses are recoverable within the context of the WPLA is determined by applying a "risk of harm" analysis, rather than by assessing damages actually sustained. *Graybar*, 112 Wn.2d at 865-67. By adopting the "risk of harm" approach, Washington joined those intermediate jurisdictions that apply "risk of harm" analysis to determine whether a defect "is so hazardous that a plaintiff's tort claim is justified even when the product has yet to injure persons or property." *See* Comment, 27 Gonz. L. Rev. at 339.

The court reasoned that "risk of harm" analysis is used to determine whether the safety-insurance policy of tort law or the expectation-bargain protection policy of warranty law is most applicable to the claim in question. *Graybar*, 112 Wn.2d at 860-61. The court stated:

> In contrast to the *East River* approach, risk of harm analysis appropriately accommodates the safety and risk-spreading policies that underlie the law of product liability, and "provides a workable and accurate distinction between accidents that should be actionable in tort and losses that should remain in the domain of warranty law."

*Graybar*, 112 Wn.2d at 865 (quoting Comment, *Asbestos in Schools and the Economic Loss Doctrine*, 54 U. Chi. L. Rev. 277, 300 (1987)). The court noted that under this approach,[3]

---

[3]The court in *Washington Water Power Co. v. Graybar Elec. Co.*, 112 Wn.2d 847, 774 P.2d 1199, 779 P.2d 697 (1989) left for another day the determination of how the risk of harm analysis would be applied. The court did discuss two approaches: the "sudden and dangerous test" approach, and the "evaluative" approach. Under the "sudden and dangerous" approach to risk of harm analysis, economic loss is distinguished from other damages according to the manner in which the product failure has occurred. If the failure is the result of a sudden and dangerous event, it is remediable under tort principles. If no such event has occurred, the product failure is deemed economic loss. The evaluative approach,

"the fact that a hazardous product defect has injured only the product itself, and not persons or other property, is properly regarded as a 'pure fortuity' ". *Graybar*, 112 Wn.2d at 865-66. In *Touchet Vly. Grain Growers, Inc. v. Opp & Seibold Gen. Constr., Inc.*, 119 Wn.2d 334, 351, 831 P.2d 724 (1992), we reaffirmed *Graybar*'s holding that use of risk of harm analysis is appropriate for determining the nature of damages.

## Court of Appeals Decision

Concluding that the case was governed by admiralty jurisdiction, the Court of Appeals turned to the choice of law question to determine which definition of "economic loss" to apply. *Stanton v. Bayliner Marine Corp.*, 68 Wn. App. 125, 129-30, 844 P.2d 1019 (1992). The court stated that "even where admiralty jurisdiction lies, state law may nevertheless displace federal law when a matter of local concern is at stake and the application of state law would not unduly disturb the uniformity of the maritime legal system." *Bayliner*, 68 Wn. App. at 131 (citing *Kossick v. United Fruit Co.*, 365 U.S. 731, 738, 6 L. Ed. 2d 56, 81 S. Ct. 886 (1961)). The court stated that this "maritime and local" determination is made by balancing state and federal interests. *Bayliner*, 68 Wn. App. at 132.

Utilizing "interest analysis", the Court of Appeals held that Washington's definition of "economic loss" should apply

---

on the other hand, proceeds on the theory that a product user should not have to suffer a calamitous event before earning his remedy. The *Graybar* court declined to decide which of these approaches is appropriate under the scheme of the WPLA. *Graybar*, 112 Wn.2d at 866-67. One commentator suggested a third approach — based on consumer expectations. *See* Comment, *Determining Recoverable Economic Harm Under the Washington Product Liability Act*, 27 Gonz. L. Rev. 335, 342-44 (1991-1992) (one would not expect the resulting damage to be caused by the product's failure to perform its intended function). The commercial expectation test asks "whether the damage caused by the product's defect goes beyond the failure of the product to do what it was supposed to do and actually poses a threat of harm. If the court finds that such a threat of harm exists, above and beyond the failure of the product to perform its intended function, then the appropriate remedy is in tort since the plaintiff is 'at risk' due to the defendant's unsafe manufacturing practices." 27 Gonz. L. Rev. at 344.

to this case. *Bayliner*, 68 Wn. App. at 132. The Court of Appeals reasoned that whatever federal interest in maritime uniformity exists, it is outweighed by "Washington's concern to ensure the personal safety of its citizens, to deter the manufacture and dissemination of dangerous products, and to exercise its authority over tortfeasors acting within its jurisdiction." *Bayliner*, 68 Wn. App. at 132 (citing generally RCW 7.72 and *Graybar*, 112 Wn.2d at 864-66). The court concluded that because a significant state interest is at stake, and because the application of Washington law would not unduly disrupt the uniformity of federal admiralty law, "federal admiralty law permits us to apply state law." *Bayliner*, 68 Wn. App. at 133.

Bayliner contends that the Court of Appeals erred in its determination that state law, and not federal admiralty law, governs the resolution of this case. Bayliner claims the rule in *Washington Water Power Co. v. Graybar Elec. Co.*, 112 Wn.2d 847, 774 P.2d 1199, 779 P.2d 697 (1989) conflicts with federal admiralty law (*East River*) instead of merely "supplementing" it. Bayliner argues that the admiralty rule in *East River S.S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 90 L. Ed. 2d 865, 106 S. Ct. 2295 (1986) therefore precludes the plaintiffs from pursuing their claim under state law.

Stanton and Albany (hereafter collectively Stanton), on the other hand, contend that the rule in *East River* does not apply to the consumer transactions involved in these cases. Stanton argues that even if *East River* does apply to the facts of this case, Washington law is not preempted by federal admiralty law since it does not interfere with the uniform application of admiralty law.

## II

### ANALYSIS

Review of the Court of Appeals decision requires inquiry into two questions: First, does admiralty jurisdiction apply? Second, if admiralty jurisdiction applies, does substantive admiralty law preempt application of Washington's rule on

"economic loss"? Although the Court of Appeals properly concluded that Washington has a significant interest in a divergent interpretation of economic loss, the court erred in holding that Washington law, as expressed in *Graybar*, displaces the admiralty rule in *East River*.

## Admiralty Jurisdiction Applies

■ Bayliner contends, and Stanton concedes, that admiralty jurisdiction applies. As the Court of Appeals stated, application of admiralty jurisdiction is appropriate "when the event giving rise to the suit occurs on navigable waters, and the potential hazard to maritime commerce arises from an activity that bears a substantial relationship to traditional maritime activity." *Bayliner*, 68 Wn. App. at 128 (citing *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 73 L. Ed. 2d 300, 102 S. Ct. 2654 (1982)).

The first part of the test is met since the accidental groundings occurred in navigable waters. The second part of the test requires a determination of whether the activity has the potential to affect maritime commerce, not whether it actually affected commerce in the specific case. *Sisson v. Ruby*, 497 U.S. 358, 366-67, 111 L. Ed. 2d 292, 110 S. Ct. 2892 (1990). The second part of the test is met since the accidental groundings in this case had the potential to affect maritime commerce. *Sisson*, at 366-67 (the operation of a pleasure vessel in navigable waters bears a relation to maritime commerce, and thus, is within admiralty jurisdiction). Admiralty jurisdiction applies, therefore, despite the fact that this suit involves noncommercial vessels. *Foremost*, 457 U.S. at 675-77 (admiralty tort jurisdiction extends to noncommercial activity such as actions arising out of the use of pleasure craft on navigable waters). *See Wahlstrom v. Kawasaki Heavy Indus., Ltd.*, 4 F.3d 1084 (2d Cir. 1993) (a fatal accident involving a Jet Ski and a 20-foot power boat on the Thames River in Connecticut); *Truehart v. Blandon*, 672 F. Supp. 929 (E.D. La. 1987). *See also* Paul N. Wonacott, *Products Liabilities of Shipbuilders and Repairers*, 62 Tul. L. Rev. 465, 476 (1987-1988).

## Choice of Law

Inasmuch as admiralty jurisdiction applies, we next determine whether substantive admiralty law precludes the application of a state law remedy. The question is whether the Court of Appeals properly determined that Washington law *supplements*, rather than conflicts with, admiralty law, allowing plaintiffs to pursue their products liability claim under Washington law. In order to reach this issue we must first decide whether the admiralty rule in *East River* applies to the consumer transaction involved in this case.

The issue resolved in *East River* was "whether a commercial product injuring itself is the kind of harm against which public policy requires manufacturers to protect, independent of any contractual obligation." *East River*, 476 U.S. at 866. The Court held that "a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself." *East River*, 476 U.S. at 871. The Court specifically reserved the issue "whether a tort cause of action can ever be stated in admiralty when the only damages sought are economic." *East River*, 476 U.S. at 871 n.6.

The parties vigorously dispute whether *East River* is limited to its commercial facts and language. Stanton contends that the language in *East River* indicates that its rule is not well established as to consumer transactions involving pleasure boats and, thus, does not preclude application of state law in this case. Bayliner, on the other hand, contends that *East River* is not limited to its commercial facts.

In support of their position, respondents cite *Sherman v. Johnson & Towers Baltimore, Inc.*, 760 F. Supp. 499 (D. Md. 1990). The *Sherman* court concluded that because the plaintiffs and the defendant were not in a commercial relationship, the rule in *East River* did not preclude plaintiffs' claim as a matter of law. *Sherman*, 760 F. Supp. at 502. In *Sherman*, buyers of a pleasure yacht destroyed by fire brought suit against the manufacturer in contract and tort. The defendant moved to dismiss the plaintiffs' tort claims under the authority of *East River*. *Sherman*, 760 F. Supp. at 501. The

*Sherman* court cited *East River*'s language reserving judgment on the issue of whether a tort cause of action "can ever be stated in admiralty", *East River*, at 871 n.6, and stated:

> "Therefore, a maritime tort claim alleging purely economic loss should not be dismissed for want of subject matter jurisdiction where the requirements for admiralty jurisdiction are otherwise met if the facts of the case support a theory of recovery *not clearly barred* by *East River* or by other controlling authority."

(Some italics ours.) *Sherman*, 760 F. Supp. at 501 (quoting *Employers Ins. v. Suwannee River Spa Lines, Inc.*, 866 F.2d 752, 760 (5th Cir. 1989)). The court held that the plaintiffs' theory of recovery was *not* barred by *East River* because *East River* limited its holding to commercial situations and this case involved a consumer (noncommercial) transaction. *Sherman*, 760 F. Supp. at 502. The court noted that other courts and commentators have drawn this same distinction. *Sherman*, 760 F. Supp. at 502 (citing *Employers Ins.*, 866 F.2d at 764 (maritime case referencing *East River* as authority for resolving commercial disputes under contract law); *Richard O'Brien Cos. v. Challenge-Cook Bros., Inc.*, 672 F. Supp. 466, 472 (D. Colo. 1987); *Consumers Power Co. v. Mississippi Vly. Structural Steel Co.*, 636 F. Supp. 1100, 1112 (E.D. Mich. 1986); David R. Owen, *Recovery for Economic Loss Under U.S. Maritime Law: Sixty Years Under Robins Dry Dock*, 18 J. Mar. L. & Com. 157, 177 n.106 (1987) (*East River* left to speculation the question of whether its rule applies in consumer cases); Robert Force, *Maritime Products Liability in the United States*, 11 Mar. Law. 1, 7, 34 (1986)).

Bayliner disputes Stanton's reliance on *Sherman*, claiming that the majority of maritime cases since *East River* have not made a distinction between commercial and noncommercial vessels. We agree. For example, *Karshan v. Mattituck Inlet Marina & Shipyard Inc.*, 785 F. Supp. 363 (E.D.N.Y. 1992) declined to follow *Sherman*. The court held that a cause of action in tort could not be stated when the only damages alleged were to the vessel itself, regardless of whether the owner was a consumer or a commercial buyer.

*Karshan*, 785 F. Supp. at 366. In that case, the owner of a yacht and insurers sued the boat seller under strict products liability theory for property losses as a result of a fire on the yacht. Much like Bayliner, the defendant argued that *East River* applied to the facts of the case and entitled defendant to summary judgment. *Karshan*, 785 F. Supp. at 364. The plaintiffs, like Stanton, attempted to distinguish *East River* on the grounds that they had alleged damage other than to the product itself, and that the boat was not purchased in a commercial transaction. *Karshan*, 785 F. Supp. at 364. The court disagreed. It found plaintiffs' claim of other property damage unsupportable and stated that the Supreme Court in *East River S.S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 90 L. Ed. 2d 865, 106 S. Ct. 2295 (1986) did not confine its rationale to commercial transactions.[4] *Karshan*, 785 F. Supp. at 365-66.

*Karshan* applied the *East River* maritime economic loss rule to a noncommercial pleasure boat, citing the Supreme Court's broad concern that tort actions and warranty actions be kept separate. The court also noted as a matter of public policy that a vessel owner can best protect himself from economic loss through insurance. *See Karshan*, 785 F. Supp. at 366. As one commentator (cited in *Karshan*) noted, the *East River* Court's expansive reasoning appears to have been directed at cutting off any movement to impose liability for economic losses, even in the consumer context. *See* Steven R. Swanson, *The Citadel Survives a Naval Bombardment: A Policy Analysis of the Economic Loss Doctrine*, 12 Tul. Mar. L.J. 135, 181 (1987).

In *Simone v. Genmar Indus., Inc.*, 1989 Am. Mar. Cas. 2627 (S.D.N.Y.), the plaintiff sued a yacht manufacturer

---

[4]As the court noted in a footnote: "[M]any of the sources cited in *East River* [*S.S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 90 L. Ed. 2d 865, 106 S. Ct. 2295 (1986)] are relevant to consumer transactions. These include: Restatement (Second) of Torts §§ 395 and 402A (1965) (cited by *East River*, 476 U.S. at 868 n. 3, 106 S.Ct. at 2300 n. 3); U.C.C. §§ 2-313, 2-314 and 2-315 (cited at 476 U.S. p. 872, 106 S.Ct. p. 2303); and *Santor v. A & M Karagheusian, Inc.*, 44 N.J. 52, 66-67, 207 A.2d 305, 312-13 [16 A.L.R.3d 670] (1965) (cited at 476 U.S. p. 868 and p. 870, 106 S.Ct. p. 2301 and p. 2302)." *Karshan v. Mattituck Inlet Marina & Shipyard Inc.*, 785 F. Supp. 363, 366 n.4 (E.D.N.Y. 1992).

alleging negligence based on a manufacturing defect. The boat had developed "gelcoat blisters" on its hull. Although the court determined that admiralty jurisdiction did not apply, it noted that under either New York or maritime jurisdiction, the result would have been the same: no recovery in tort for product liability damages to the product itself. *Simone*, 4 Am. Mar. Cas. at 2629 (citing *East River*, 476 U.S. at 871).

In *Sisson v. Hatteras Yachts, Inc.*, 778 F. Supp. 959 (N.D. Ill. 1991), plaintiffs sought damages for economic loss, alleging that their yacht was damaged by a defective washer/dryer unit. The court granted the defendants' motion for summary judgment based on the rule in *East River*, holding that the plaintiffs were precluded from recovery in tort.

In *Lewinter v. Genmar Indus., Inc.*, 1993 Am. Mar. Cas. 939 (Cal. Super. Ct.), plaintiffs sued the yacht manufacturer alleging negligence and strict liability for defective lamination of yacht sections which resulted in catastrophic hull failure. The defendant moved for summary judgment, claiming that the rule in *East River* precluded recovery for economic losses arising out of damage to the product itself. The plaintiffs, like Stanton, argued that *East River* was not applicable because there was no commercial relationship between plaintiffs and defendant manufacturer. The court, citing *Sisson v. Hatteras, supra,* and *Karshan v. Mattituck Inlet Marina & Shipyard Inc., supra,* refused to limit *East River* to commercial transactions. *Lewinter*, 1993 Am. Mar. Cas. at 944-47. The court noted the *Sherman* decision but found the reasoning of *Sisson* and *Karshan* more persuasive:

> The *Sherman* Court correctly noted that many of the passages in *East River* refer to "commercial" transactions and relationships, and that the *East River* Court limited its holding to commercial situations. However, *Sisson* and *Karshan* correctly observe that most, if not all, of *East River*'s reasoning is equally applicable to so called "consumer" transactions.

*Lewinter*, 1993 Am. Mar. Cas. at 946-47. *See also* Swanson, 12 Tul. Mar. L.J. at 181 (*East River*'s reasoning applicable in consumer context). The *Lewinter* court emphasized that any

attempt to limit *East River* to commercial, as opposed to consumer, transactions could create confusion, unfairness, and unpredictability: "A manufacturer's expectation of, and entitlement to, the protection of *East River* should not, and cannot, turn on the purpose a downstream purchaser, with which the manufacturer had no dealings, had in purchasing the vessel." *Lewinter*, 1993 Am. Mar. Cas. at 948.

In addition to these maritime cases applying *East River* to consumer transactions, Bayliner cites several land-based cases which have applied *East River* to noncommercial facts.[5] For example, in *Dairyland Ins. Co. v. General Motors Corp.*, 549 So. 2d 44 (Ala. 1989), the Alabama Supreme Court applied *East River* to deny recovery in tort to a consumer buyer of a General Motors van which caught fire while being driven and was destroyed. In *Waggoner v. Town & Country Mobile Homes, Inc.*, 808 P.2d 649 (Okla. 1990), the court applied the holding in *East River* to deny tort recovery where consumer mobile home purchasers brought an action against the manufacturer for defective roofs. In *Danforth v. Acorn Structures, Inc.*, 608 A.2d 1194 (Del. 1992), a buyer brought a products liability action against the seller of a home building kit. The court similarly refused to create an exception to the *East River* rule for a noncommercial consumer. *Danforth*, at 1200.

■ On balance, the weight of authority interprets *East River*'s maritime products liability rule as applicable to both commercial and consumer transactions. As the Supreme Court noted in *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 675-76, 73 L. Ed. 2d 300, 102 S. Ct. 2654 (1982), the federal interest in protecting maritime commerce cannot be adequately served if admiralty jurisdiction is restricted to those individuals actually engaged in commercial maritime activity. Bayliner further argues that a strict commercial/noncommercial distinction makes no sense given the facts of

---

[5]Although *Washington Water Power Co. v. Graybar Elec.Co.*, 112 Wn.2d 847, 774 P.2d 1199, 779 P.2d 697 (1989) was also a land-based case, it declined to apply *East River S.S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 90 L. Ed. 2d 865, 106 S. Ct. 2295 (1986) because of its definition of "economic loss", not because of any dispute over its application to consumer transactions.

this case: one of the plaintiffs, Stanton Investment Co., is a corporation and is therefore a commercial entity and that, in addition, the plaintiffs' claims have been brought by a subrogated insurance carrier which, arguably, is not a consumer.[6]

■ Because plaintiffs suffered damage to property other than the boats, they claim that by reason thereof they are entitled to recover not only the value of the personal property, but also the value of the boats. We disagree. This argument was advanced and rejected in *Lewinter v. Genmar Indus., Inc.*, 1993 Am. Mar. Cas. at 948-49. *See also Nicor Supply Ships Assocs. v. General Motors Corp.*, 876 F.2d 501 (5th Cir. 1989). In this case, the trial court properly preserved for trial Stantons' claims for losses to personalty which was not equipment or furniture of the *Moonraker. See Sherman v. Johnson & Towers Baltimore, Inc.*, 760 F. Supp. 499, 502-03 (D. Md. 1990) (plaintiffs may assert a claim in tort for economic damage which goes beyond the product itself).

In summary, the weight of authority persuades us that the rule in *East River* does apply to consumer transactions involving pleasure boats. We must next determine whether *East River*'s maritime economic loss rule applies to the exclusion of state law.

### Substantive Admiralty Law Preempts Application of a State Law Remedy

Applying "interest analysis", the Court of Appeals concluded that Washington's definition of "economic loss" should apply. *Stanton v. Bayliner Marine Corp.*, 68 Wn. App. 125, 132, 844 P.2d 1019 (1992) (citing *Kossick v. United Fruit Co.*, 365 U.S. 731, 738-42, 6 L. Ed. 2d 56, 81 S.

---

[6]In response, Stanton cites *Farmers Home Mut. Ins. Co. v. Insurance Co. of North Am.*, 20 Wn. App. 815, 583 P.2d 644 (1978), *review denied*, 91 Wn.2d 1014, *cert. denied*, 442 U.S. 942 (1979) as authority that a federal admiralty rule applicable to insurance clauses covering commercial ships did not apply to recreational boats. The court noted that the interpretation of marine insurance policies was left to the states because there was no well-established federal rule on point. *Farmers*, at 819. In this case, application of *East River*'s maritime economic loss rule to consumer, recreational boats is well established.

Ct. 886 (1961)). Citing *East River S.S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 864, 90 L. Ed. 2d 865, 106 S. Ct. 2295 (1986), Bayliner argues that "[w]ith admiralty jurisdiction comes the application of substantive admiralty law." Bayliner contends that the application of substantive admiralty law in this case means that no products liability claim lies in admiralty when the only injury claimed is economic loss. Stanton, on the other hand, argues that state law is not preempted if it does not interfere with the uniform system of federal maritime law. Stanton claims that Washington law "supplements" the remedies available in admiralty.

Article 3, section 2 of the United States Constitution provides in part that the judicial power of the United States shall extend "to all cases of admiralty and maritime jurisdiction". This provision, by implication, grants Congress the power to revise and supplement the maritime law, and grants federal courts power to develop the general maritime law. *Pacific Merchant Shipping Ass'n v. Aubry*, 918 F.2d 1409, 1421 (9th Cir. 1990) (citing *Romero v. International Terminal Operating Co.*, 358 U.S. 354, 360-61, 3 L. Ed. 2d 368, 79 S. Ct. 468 (1959)), *cert. denied*, 119 L. Ed. 2d 578 (1992). State courts, however, have concurrent jurisdiction over maritime claims. *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 222, 91 L. Ed. 2d 174, 106 S. Ct. 2485 (1986).

The process of determining the applicability of state law in cases within the admiralty jurisdiction has been described as one of accommodation, "entirely familiar in many areas of overlapping state and federal concern, or a process somewhat analogous to the normal conflict of laws situation where two sovereignties assert divergent interests in a transaction as to which both have some concern." *Kossick*, 365 U.S. at 739 (citing with approval the application of state wrongful death statutes, *The Tungus v. Skovgaard*, 358 U.S. 588, 3 L. Ed. 2d 524, 79 S. Ct. 503 (1959); *The Hamilton*, 207 U.S. 398, 52 L. Ed. 264, 28 S. Ct. 133 (1907); and state survival of actions statutes, *Just v. Chambers*, 312 U.S. 383, 85 L. Ed. 903, 61 S. Ct. 687 (1941)).

■ Relying on *Kossick*, the Court of Appeals stated that even though a cause of action arises under admiralty jurisdiction, state law may "displace" federal law when a matter of local concern is at stake and the application of state law would not disturb the uniformity of maritime law. *Bayliner*, 68 Wn. App. at 131-32. Although *Kossick* endorsed the notion of balancing local concerns against federal interests in some circumstances, it does not stand for the proposition that state law may displace *conflicting* federal law. *See Kossick*, 365 U.S. at 742.

The federal statute conferring admiralty jurisdiction on federal district courts "sav[es] to suitors in all cases all other remedies to which they are otherwise entitled." 28 U.S.C. § 1333(1). The Supreme Court has said that this statute

> leaves state courts competent to adjudicate maritime causes of action in proceedings *in personam* and means that "a state, 'having concurrent jurisdiction, is free to adopt such remedies, and to attach to them such incidents, as it sees fit,' so long as it does not attempt to [give *in rem* remedies or] make changes in the 'substantive maritime law.' " Stated another way, the "saving to suitors" clause allows state courts to entertain *in personam* maritime causes of action, but in such cases *the extent to which state law may be used to remedy maritime injuries is constrained by a so-called "reverse-Erie" doctrine which requires that the substantive remedies afforded by the States conform to governing federal maritime standards.*

(Citation omitted. Some italics ours.) *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. at 222-23 (quoting *Madruga v. Superior Court*, 346 U.S. 556, 560-61, 98 L. Ed. 290, 74 S. Ct. 298 (1954)).

In *Bohemia, Inc. v. Home Ins. Co.*, 725 F.2d 506, 510 (9th Cir. 1984), the court, interpreting both *Kossick v. United Fruit Co., supra*, and *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 99 L. Ed. 337, 75 S. Ct. 368 (1955), stated that state law will control "in the absence of a federal statute, a judicially fashioned admiralty rule, or a need for uniformity in admiralty practice". *Accord, Port Lynch, Inc. v. New England Int'l Assurety of Am., Inc.*, 754 F. Supp. 816, 820 (W.D. Wash. 1991); *Pacific Merchant Shipping Ass'n v. Aubry*, 918 F.2d 1409 (9th Cir. 1990). The *Aubry*

court similarly concluded that the general rule on preemption in admiralty is that "states may supplement federal admiralty law as applied to matters of local concern, so long as state law does not *actually conflict* with federal law or *interfere* with the *uniform working* of the maritime legal system." *Aubry*, 918 F.2d at 1422.

Applying this standard, we next determine whether application of the rule on economic loss in *Washington Water Power Co. v. Graybar Elec. Co.*, 112 Wn.2d 847, 774 P.2d 1199, 779 P.2d 697 (1989) conflicts with federal law, or whether it would disrupt the uniform application of maritime law.

### Federal Preemption, *Graybar*, and

### the Economic Loss Rule

It is undisputed that the design or manufacture of a defective product may qualify as a maritime tort. In *East River*, the Supreme Court incorporated products liability, including strict liability, into the general maritime law and held that no products liability claim lies in admiralty when the only injury claimed is economic loss. *East River*, 476 U.S. at 865, 876. *East River* stands as a "judicially fashioned admiralty rule" applicable to the facts of this case.

■ ■ The WPLA does not conflict with the holding in *East River*. Both the WPLA and *East River* exclude damage claims for "economic loss". RCW 7.72.010(6); *Graybar*, 112 Wn.2d at 856-60. As Bayliner argues, however, it is *Graybar*'s definition of "economic loss", which does not follow *East River*'s analysis, that creates a conflict between the state and federal remedies. This conflict requires application of the federal admiralty rule of *East River*. *See Offshore Logistics, Inc. v. Tallentire, supra; Pacific Merchant Shipping Ass'n v. Aubry, supra.* We hold the Supreme Court's holding in *East River* precludes application of a state remedy insofar as plaintiffs seek recovery for the economic loss of the yachts.[7] *See Sisson v. Hatteras Yachts, Inc.*, 778 F. Supp. 959 (N.D. Ill. 1991).

---

[7]We note, however, that application of the maritime admiralty rule in this case does not affect the holding in *Washington Water Power Co. v. Graybar Elec. Co.*, 112 Wn.2d 847, 774 P.2d 1199, 779 P.2d 697 (1989) as to land-based product liability actions.

Washington's interest in this matter does not outweigh federal interests in the uniformity of maritime laws. Holding that Washington's definition of "economic loss" should apply in this case, the Court of Appeals concluded that "[w]hatever federal interest in uniformity exists, it is outweighed by Washington's concern to ensure the personal safety of its citizens, to deter the manufacturer and dissemination of dangerous products, and to exercise its authority over tortfeasors acting within its jurisdiction." *Bayliner*, 68 Wn. App. at 132. Bayliner argues that the state interests articulated by the Court of Appeals do not obviate the need for uniformity in maritime products liability law. We agree.

First, the court need not engage in "interest analysis" where there is a conflict between the state and federal remedies for economic loss; such conflicts are resolved in favor of federal maritime law. *See Tallentire*, 477 U.S. at 222-23. Second, assuming *arguendo* that there was *no* conflict of laws, the determination of whether the *Graybar* rule disrupts federal maritime harmony depends on the balance of federal and state interests involved. *See Aubry*, 918 F.2d at 1424 (citing *Kossick*, 365 U.S. at 741-42). Washington's interest in providing a remedy for these plaintiffs does not outweigh federal interests in maritime uniformity.

In *Berg v. General Motors Corp.*, 87 Wn.2d 584, 591-96, 555 P.2d 818 (1976), this court adopted a minority view with respect to the meaning of "economic loss" and held that a purchaser of a defective engine for a fishing boat could recover from the manufacturer lost profits for the fishing season that resulted from the defective engine. The Legislature overruled *Berg* and adopted the analysis of the California Supreme Court in *Seely v. White Motor Co.*, 63 Cal. 2d 9, 403 P.2d 145, 45 Cal. Rptr. 17 (1965),[8] when it enacted the 1981 products liability act. Talmàdge, *Product Liability Act of 1981: Ten Years Later*, 27 Gonz. L. Rev. 153, 168-69

---

[8]In *Seely v. White Motor Co.*, 63 Cal. 2d 9, 403 P.2d 145, 45 Cal. Rptr. 17 (1965), the court denied recovery to a plaintiff who had pleaded lost profits as the only damages under a negligence theory.

(1991-1992). *See also Graybar*, 112 Wn.2d at 857-58. The preamble to the 1981 act states in part:

> It is the intent of the legislature to treat the consuming public, the product seller, the product manufacturer, and the product liability insurer in a balanced fashion in order to deal with [problems associated with rising premiums for product liability insurance].
>
> It is the intent of the legislature that the right of the consumer to recover for injuries sustained as a result of an unsafe product not be unduly impaired. It is further the intent of the legislature that retail businesses located primarily in the state of Washington be protected from the substantially increasing product liability insurance costs and unwarranted exposure to product liability litigation.

Laws of 1981, ch. 27, § 1. *See also* Philip A. Talmadge, *Washington's Product Liability Act*, 5 U. Puget Sound L. Rev. 1 (1981). In reaching an appropriate "balance", the Legislature specifically excluded from the WPLA recovery for economic loss in tort, deferring such claims instead to the UCC. *See* RCW 7.72.010(6); RCW 7.72.020(2). In the tort reform act of 1986, the Legislature again noted the social costs associated with liability insurance and stated "it is the intent of the legislature to reduce costs associated with the tort system, while assuring that adequate and appropriate compensation for *persons injured* through the fault of others is available." (Italics ours.) Laws of 1986, ch. 305, § 100. Washington does have an interest in preserving appropriate remedies for personal injury; the loss at issue in this case, however, is purely economic.

The *Graybar* court, however, found *East River*'s approach to economic loss unsuited to what the Legislature intended under the WPLA. *Graybar*, 112 Wn.2d at 864. *See also Stuart v. Coldwell Banker Comm'l Group, Inc.*, 109 Wn.2d 406, 417-22, 745 P.2d 1284 (1987) (indicating support for risk of harm analysis). The *Graybar* court carefully analyzed the statute and concluded that the WPLA incorporates the "risk of harm" analysis. *Graybar*, 112 Wn.2d at 866. However, there is no indication by the Legislature or this court that Washington's interests in deterring the manufacture and dissemination of dangerous products outweigh the need for

a uniform *maritime* law of products liability. Indeed, the *Graybar* court acknowledged that the Supreme Court in *East River S.S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 90 L. Ed. 2d 865, 106 S. Ct. 2295 (1986) exercised its authority to determine the substantive *admiralty* law. *Graybar*, 112 Wn.2d at 861-62. As Bayliner argues, there is no support for a rule of exception for economic loss in maritime products liability cases based on Washington law.

The adherence to uniformity in maritime law is evident in recent federal case law. The Supreme Court in *Sisson v. Ruby*, 497 U.S. 358, 367, 111 L. Ed. 2d 292, 110 S. Ct. 2892 (1989) extended the analysis in *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 73 L. Ed. 2d 300, 102 S. Ct. 2654 (1982) beyond the rules of navigation to state that other rules of maritime liability should be uniform between commercial and noncommercial vessels: "The need for uniform rules of maritime conduct and liability is not limited to navigation, but extends at least to any other activities traditionally undertaken by vessels, commercial or noncommercial."

In *Texaco Ref. & Mktg., Inc. v. Estate of Tran*, 808 S.W.2d 61 (Tex. Sup. Ct.), *cert. denied*, 116 L. Ed. 2d 245 (1991), the court determined whether survivors of a man who was killed in a maritime incident were entitled to damages for mental anguish and loss of society, which are not recoverable under general maritime law. The court applied the criteria of *Sisson v. Ruby, supra*, for maritime jurisdiction and held that "[w]here general maritime law is properly invoked . . . a trial court's failure to award damages consistent with maritime law is clearly reversible error." *Texaco Ref. & Mktg., Inc.*, 808 S.W.2d at 64.

The court emphasized that general maritime law preempts state causes of action and remedies, consistent with the "longstanding desire of Congress and the judiciary to achieve uniformity in the exercise of admiralty jurisdiction". *Texaco Ref. & Mktg., Inc., supra* at 64 (citing *Foremost*, 457 U.S. at 676-77; *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 223, 91 L. Ed. 2d 174, 106 S. Ct. 2485 (1986)); *accord Wahlstrom v. Kawasaki Heavy Indus., Ltd.*, 4 F.3d

1084, 1087-88 (2d Cir.1993) (federal maritime law, whether or not it conflicts with state law, applies to an action for wrongful death in state territorial waters brought under the admiralty jurisdiction of the federal courts). Likewise, in *Anderson v. Whittaker Corp.*, 692 F. Supp. 764 (W.D. Mich. 1988), *aff'd in part, rev'd in part on other grounds*, 894 F.2d 804 (6th Cir. 1990), a case involving the sinking of a private yacht, the court rejected the argument that state products liability law should apply:

> Plaintiffs have raised the argument that because they have access to a remedy under state products liability law, this in some way lessens the federal interest over the controversy. The analysis employed in *Foremost*, however, makes it clear that *the existence of a parallel state remedy is of no consequence.* If a sufficient federal interest exists to justify the exercise of maritime jurisdiction, the application of maritime law will follow as a matter of federal supremacy. *See* 457 U.S. at 674-75, 102 S.Ct. at 2658.

(Some italics ours.) *Anderson*, 692 F. Supp. at 768 n.2; *accord Karshan v. Mattituck Inlet Marina & Shipyard Inc.*, 785 F. Supp. 363 (E.D.N.Y. 1992); *Sisson v. Hatteras Yachts, supra.* In this case, sufficient federal interest exists to justify the exercise of maritime jurisdiction. Consequently, with admiralty jurisdiction comes the application of substantive admiralty law. *East River*, 476 U.S. at 864. *See Zukowsky v. Brown*, 79 Wn.2d 586, 590 n.1, 488 P.2d 269 (1971). There is no persuasive authority to compel a different result in this case.

In summary, federal maritime law preempts application of a conflicting state law where there is a judicially fashioned admiralty rule on point. *East River* is the maritime rule on economic loss. To the extent that *Washington Water Power Co. v. Graybar Elec. Co., supra*, is read to conflict with *East River*, the federal admiralty rule controls. *Graybar* is controlling as to land-based product liability claims. Even considering "interest analysis", there is no authority to indicate that Washington's interest in product liability law outweighs or displaces federal interests in uniform maritime law. *See Anderson v. Whittaker Corp.*, 692 F.

Supp. at 767 (there is strong federal interest in providing uniform standards for the design and manufacture of products that have the potential to affect traditional maritime activities).

## CONCLUSION

The plaintiffs' claims arise under admiralty jurisdiction. We hold, therefore, that substantive admiralty law precludes recovery for economic loss. Plaintiffs' remedy, if any, for economic loss to the yachts may be pursued in warranty against the seller under the UCC (RCW 62A). We reverse the Court of Appeals and remand for further proceedings consistent with this opinion.

ANDERSEN, C.J., and DOLLIVER, DURHAM, and MADSEN, JJ., concur.

UTTER, J. (dissenting) — I dissent. The majority reasons that state law will control "in the absence of a federal statute, a judicially fashioned admiralty rule, or a need for uniformity in admiralty practice". Majority, at 82 (quoting *Bohemia, Inc. v. Home Ins. Co.*, 725 F.2d 506, 510 (9th Cir. 1984)). There is no assertion that a federal statute is involved. Thus, the only questions at issue in this case are whether a judicially fashioned admiralty rule conflicts with state law and whether application of state law will jeopardize uniformity in admiralty law in such a way as to void its applicability. Since the answer to both questions is no, I would hold that noncommercial plaintiffs in admiralty are not prevented under federal admiralty law from recovering under the Washington products liability act (WPLA) for the value of a product itself when a defect in the product endangers people and damages property other than the product itself.

The majority's holding proceeds first on the mistaken premise that federal and state law conflict. They do not. Both laws permit recovery in product liability for the value of a purchased product where the transaction is of a non-

commercial nature and the product endangers people and damages property other than the product itself.

In Washington, the WPLA governs product liability claims. RCW 7.72. The WPLA imposes liability on manufacturers where a claimant's "harm" is proximately caused by a manufacturer. RCW 7.72.030. "Harm" does not include direct or consequential "economic loss". RCW 7.72.010(6). By adopting a narrow definition of "economic loss", the court in *Washington Water Power Co. v. Graybar Elec. Co.*, 112 Wn.2d 847, 774 P.2d 1199, 779 P.2d 697 (1989) unanimously preserved the right of consumers to treat damage to a product itself as compensable "harm" under the WPLA if the damage does not constitute "economic loss" as determined by a "risk of harm" analysis. Risk of harm analysis looks to the nature of the defect, the type of risk, and the manner in which the injury arose. *Graybar*, 112 Wn.2d at 861. The majority concedes that state law might afford the Stantons and Henry recovery under the WPLA.

The majority asserts that despite the otherwise controlling effect *Graybar* would have on land-based actions, majority at 87, *Graybar* should not apply in cases involving federal admiralty jurisdiction. The majority's holding is premised on a misapprehension of the scope of *East River S.S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 90 L. Ed. 2d 865, 106 S. Ct. 2295 (1986). It improperly views the Court of Appeals decision as creating an "exception" to the *East River* rule. Majority, at 79. Under the guise of merely applying *East River*'s holding, the majority in fact *expands East River*. By doing so it artificially creates a conflict between state and federal admiralty law where none exists.

The majority extends *East River* in two significant ways. First, it extends the *East River* doctrine to noncommercial relationships. The plain holding of *East River* is as follows: "a manufacturer *in a commercial relationship* has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself". (Italics mine.) *East River*, 476 U.S. at 871. The reasons for distinguishing between commercial and noncommercial relationships for

liability purposes have been widely acknowledged. The *East River* Court itself reasoned "the *commercial user* stands to lose the value of the product, *risks the displeasure of its customers who find that the product does not meet their needs, or, as in this case, experiences increased costs in performing a service.*" (Italics mine.) *East River*, 476 U.S. at 871.[9] The plaintiffs currently before the court are consumers who bought their yachts in noncommercial transactions for the demonstrated purpose of pleasure boating, not for transporting cargo or for otherwise performing commercial services.[10] Furthermore, Bayliner, the manufacturer of the yachts, is alleged to manufacture and design such yachts for recreational use. Clerk's Papers, at 145. The holding of *East River* therefore does not apply to this case.

Various cases are cited by the majority to support its holding that *East River* should be extended to noncommercial cases. Majority, at 76-79. These decisions are not controlling, as they are holdings from other jurisdictions. Furthermore, at least one court has recognized that *East River* does *not* extend to noncommercial relationships. *See Sherman v. Johnson & Towers Baltimore, Inc.*, 760 F. Supp. 499 (D. Md. 1990) (concluding that because the plaintiffs

---

[9]*See also East River S.S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 873, 90 L. Ed. 2d 865, 106 S. Ct. 2295 (1986) (citing *Henningsen v. Bloomfield Motors, Inc.*, 32 N.J. 358, 161 A.2d 69 (1960)); *Sherman v. Johnson & Towers Baltimore, Inc.*, 760 F. Supp. 499 (D. Md. 1990); W. Page Keeton, Dan B. Dobbs, Robert Keeton, & David G. Owen, *Prosser and Keeton on Torts* § 101, at 708 (5th ed. 1984), at 98 (Supp. 1988); Bungert, *Compensating Harm to the Defective Product Itself—A Comparative Analysis of American and German Products Liability Law*, 66 Tulane L. Rev. 1179, 1249-51 (1992); Jones, *Product Defects Causing Commercial Loss: The Ascendancy of Contract over Tort*, 44 U. Miami L. Rev. 731, 754-56 (1989-1990).

[10]Although one of the purchasers was a corporate entity, there was no evidence the purchase was part of a commercial relationship. The touchstone of whether a transaction is "commercial" is not whether a purchaser is a corporate entity but rather whether the transaction involves commercial attributes, including relatively proportionate bargaining power. *See generally East River*, 476 U.S. at 872-73. Additionally, I disagree with the majority's implication that the presence of insurers is of consequence in bringing this case within the scope of *East River*. The insurers possessed neither bargaining power regarding the purchase of the yachts nor commercial use for the yachts.

and the defendant were not in a commercial relationship, the *East River* rule did not preclude claim in tort).

The majority inappropriately extends *East River* in a second significant manner by extending *East River* to scenarios involving grave risk to people and damage to property other than the product itself. In *East River*, neither people nor other property was injured or even endangered. Indeed, the *East River* Court expressly noted "[i]n the traditional 'property damage' cases, the defective product damages other property. In this case, there was no damage to 'other' property." *East River*, 476 U.S. at 867. *East River* therefore does not categorically prohibit recovery for damage to a product itself. The court neither formulated a principle nor expressed an opinion on the proper rule for cases involving injury or risk to people and property other than the product itself. Therefore, federal and state law do not conflict, and state law will control if it does not excessively jeopardize federal harmony.

Here the majority commits its second error, concluding that even if there were no conflict of laws, the federal interest in uniformity outweighs the state interest in permitting recovery where risk of harm analysis deems injury to a product itself to be noneconomic.

The need for uniformity requires a balancing of federal interests against state interests. However, "[t]he Constitution tolerates some disharmony in admiralty law . . . states may supplement admiralty law, and states' supplementation of admiralty law necessarily creates some discord in that law". *Pacific Merchant Shipping Ass'n v. Aubry*, 918 F.2d 1409, 1424 (9th Cir. 1990). Accordingly, the balancing test should be applied in order to determine whether the state law "*unduly disrupts* harmony in the federal admiralty system". *Pacific Merchant*, 918 F.2d at 1424.

Critical to this balancing test is an identification of some degree of uniformity in federal admiralty law against which state interests can be measured. However, the courts sitting in admiralty are themselves split regarding whether noncommercial plaintiffs may recover for the value of a product

itself if people are not endangered and no property other than the product itself is damaged. Moreover, courts in admiralty are silent as to whether plaintiffs, whether noncommercial or commercial, can recover for the value of a product itself when people are endangered and property other than the product itself is damaged. In this context, it is inappropriate for the court to claim that recognition of the state remedy would disrupt federal uniformity.

In an attempt to identify a uniformity in federal law against which state interests must be unfavorably examined, the majority asserts that commercial and noncommercial vessels must be treated uniformly under admiralty law. Majority, at 86. The law it cites for this proposition, however, does no more than hold that commercial and noncommercial ships must be treated identically for the purpose of determining whether a case is subject to admiralty *jurisdiction*. *See Sisson v. Ruby*, 497 U.S. 358, 111 L. Ed. 2d 292, 110 S. Ct. 2892 (1990); *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 73 L. Ed. 2d 300, 102 S. Ct. 2654 (1982). The rules governing jurisdiction are not the same as those governing the application of substantive law. *See Bell v. Hood*, 327 U.S. 678, 90 L. Ed. 939, 66 S. Ct. 773 (1946). To the extent *Sisson* and *Foremost* might encourage courts to treat commercial and noncommercial relationships identically for purposes of substantive law, such viewpoint is dicta and, as such, not controlling. The federal interest in uniformly denying recovery to noncommercial plaintiffs whose lives were endangered and who suffered damage to property other than the product itself is nonexistent, and the need to preserve an alleged uniformity in admiralty law is thus weak at best.

Juxtaposed against this silence in federal law is a clearly articulated state interest in favor of recognizing a possible WPLA claim in this context. As the Court of Appeals noted:

Whatever federal interest in uniformity exists, it is outweighed by Washington's concern to ensure the personal safety of its citizens, to deter the manufacture and dissemination of dangerous products, and to exercise its authority over tortfeasors acting within its jurisdiction. The WPLA, whose very application is at issue in this case, itself attests to those interests.

*Stanton v. Bayliner Marine Corp.*, 68 Wn. App. 125, 132, 844 P.2d 1019 (1992). Since state law does not interfere with the uniform application of admiralty law, I would agree with the Court of Appeals that our state's interests outweigh the interest in an alleged uniformity in federal admiralty law and that Washington law should apply.

There is no conflict between federal admiralty law and state law on the facts of these consolidated cases. Neither does the need for a uniform federal admiralty law outweigh the state interest in recognizing a claim involving endangerment of human life and damage to property other than the product itself. The rule in *Washington Water Power Co. v. Graybar Elec. Co.*, 112 Wn.2d 847, 774 P.2d 1199, 779 P.2d 697 (1989) thus applies and the Court of Appeals should be affirmed. I would remand the case for a determination of whether the Stantons and Henry state a claim under the WPLA and the risk of harm approach adopted by *Graybar*. Because there is no need to consider whether commercial or noncommercial plaintiffs in admiralty are prevented by federal admiralty law from recovering under the WPLA where life and property were neither injured nor endangered, I do not reach those issues.

BRACHTENBACH, SMITH, and JOHNSON, JJ., concur with UTTER, J.

Reconsideration denied March 10, 1994.